**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **Corporate Lodging Consultants, Inc.,** | **CASE NO. 1:21-CV-1611** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **Mary Szafarski, et al.,** | **MEMORANDUM OF OPINION AND** |
| **Defendants.** | **ORDER** |

This matter comes before the Court upon Plaintiff Corporate Lodging Consultants, Inc.'s Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing, which was filed on August 18, 2021. (Doc. No. 3.)  The Court conducted a telephonic conference with counsel for Plaintiff, counsel for Defendant Mary Szafarski, and Robert Campbell, CEO of Campbell Resources, Ltd. on August 19, 2021.[1]  For the following reasons, Plaintiff's Motion is GRANTED IN PART and DENIED IN PART, as set forth below.

I.  **Background**

  a.  **Factual Background**

The Verified Complaint contains the following factual allegations. Plaintiff Corporate Lodging Consultants, Inc. (hereinafter "Plaintiff" or "CLC") is a Kansas corporation that provides "comprehensive lodging solutions for businesses by streamlining long-term and project-based

---

[1] Genevieve Gold, counsel for Defendant Campbell, was also present.  However, as she is not admitted in the State of Ohio, she did not speak on behalf of Defendant Campbell during the conference.  The Court did permit Ms. Gold to communicate with Mr. Campbell to provide legal advice, as necessary, during the conference.

lodging for workforces." (Doc. No. 1 at ¶¶ 15, 16.)  It specializes in providing cost effective lodging solutions for its corporate clients and has been in business for over 40 years.  (*Id*. at ¶ 21.)

Plaintiff has negotiated exclusive pricing with over 15,000 hotels and "relies on its relationships with vendors and the goodwill that it has generated with customers over decades." (*Id*. at ¶¶ 22, 23.)  Plaintiff alleges that, over time, it has developed a proprietary sales model, "which includes prospecting, identifying, and qualifying potential corporate clients." (*Id*. at ¶ 25.)  Sales information (including client contact information, preferences, travel pattern analytics, and sales notes) is stored in Plaintiff's Customer Relation Management ("CRM") software, known as "Salesforce." (*Id*. at ¶ 26.)  According to Plaintiff, "[d]eveloping one customer account could cost upwards of hundreds of thousands of dollars." (*Id*. at ¶ 27.)  Information about "thousands of customers and potential customers is stored in Salesforce." (*Id.*)  Additionally, Plaintiff stores confidential pricing information, contract details, room usage, and other sales metrics in its internal Intranet.  (*Id*. at ¶ 28.)  Finally, Plaintiff maintains proprietary software platforms (known as Talon and Genesis) which also "house a wealth of customer information and which CLC operates so that its sales personnel will have reliable access to key information when taking care of customers." (*Id*. at ¶ 29.)

Plaintiff alleges that it takes "a number of steps to protect its critical information concerning business and sales strategies, pricing, and customer relationships from being available to competitors . . . includ[ing]: (1) confidentiality agreements and restrictive covenants executed by sales executives and key employees; (2) IT security, such as password protection, termination of access rights at the close of employment, and safeguards to prevent the computer system from being hacked; (3) exit procedures, including exit memoranda sent to departing employees and exit interviews, in which

2

departing employees are reminded of their obligations to return all CLC proprietary materials and information; and (4) need-to-know restrictions that limit access to confidential information to particular employees." (*Id.* at ¶ 30.) In addition, Plaintiff maintains various policies to protect its confidential information, including policies covering Corporate Opportunities, Protection and Proper Use of Company Assets, Confidentiality, Theft, Comdata Property, and Electronic Media Policies. (*Id.* at ¶ 32.)

Defendant Mary Szafarski began working for Plaintiff as a Senior Sales Director but was later demoted to a Junior Sales Director. (*Id.* at ¶ 33.) Melissa Smith nee Stevens (who is not named as a Defendant) was also employed by Plaintiff as a Junior Sales Director during this time frame. (*Id.* at ¶ 34.) As Sales Directors, both Szafarski and Smith could access and view information related to clients stored in the CRM, including "point of contact for the client, contact information, the salesperson servicing the account, notes related to the client and client preferences, as well as opportunities reports and historical data." (*Id.* at ¶ 36.) Szafarski and Smith also had access to Plaintiff's Intranet, which included contract terms, hotel usage reports, and pricing for specific vendors, and negotiated pricing for specific customers. (*Id.* at ¶ 37.) Lastly, Szafarski and Smith had access to Monthly Production Reports, which included "the names of hundreds of clients, the projections for those clients, and the actual productions of clients." (*Id.* at ¶ 38.)

Smith executed an "Employment Covenants Agreement" with Plaintiff on December 18, 2014, which is attached to the Verified Complaint as Exhibit A. (Doc. No. 1-2.) This Agreement contains confidentiality, non-competition, and non-solicitation provisions. (*Id.*) Plaintiff does not allege that Defendant Szafarski executed an employment agreement during her tenure at CLC. Rather, Plaintiff alleges that, on March 30, 2018, Szafarski "received and acknowledged" a document

3

entitled "Employee's Non-Disclosure and Noncompetition Agreement." (Doc. No. 1 at ¶ 40; Doc. No. 1-3.) In response to receiving this document, Szafarski states "I will print this out and review." (Doc. No. 1-3 at PageID# 37.)

On May 5, 2021, Smith resigned her employment with Plaintiff and began working for Defendant Campbell Resources Ltd. (hereinafter "Campbell") as a National Sales Manager. (Doc. No. 1 at ¶¶ 53, 63.) The following month, on June 4, 2021, Defendant Szafarski also resigned from Plaintiff and began working for Campbell as a National Sales Manager, allegedly having been recruited by Smith. (*Id.* at ¶¶ 54, 63.) Both Szafarski and Smith attended exit interviews, during which "they were reminded [by Plaintiff] of their obligations to safeguard CLC's confidential information and trade secrets as well as to return any of CLC's tangible or intellectual property." (*Id.* at ¶ 55.) Both Szafarski and Smith returned their company laptops and Plaintiff subsequently terminated Smith's access to Plaintiff's remote desk-site and Salesforce. (*Id.* at ¶ 56.) However, due to an "internal error," Szafarski's access to CRM (including Salesforce) was not terminated when her employment ended. (*Id.* at ¶ 7.)

Plaintiff alleges that Campbell "is a travel company, seeking to expand into the workforce lodging market." (*Id.* at ¶ 18.) Plaintiff alleges that Campbell "built its reputation as a business and leisure travel company catering to individuals and companies under the brand name Campbell Travel." (*Id.* at ¶ 61.) Campbell helped its clients coordinate hotels, airfare, and vehicle rental primarily through the Global Distribution System but, according to Plaintiff, Campbell "did not specialize in workforce lodging, consolidated billing, or offering proprietary rates." (*Id.*) Plaintiff alleges that Campbell recently "launched a new brand – Campbell Lodging – which directly competes with CLC for corporate clients in need of workforce lodging solutions." (*Id.* at ¶ 62.) Plaintiff claims

4

that "Campbell hired Smith and Szafarski to serve as National Sales Managers for its new venture in workforce lodging – positions that are substantially similar to their roles at CLC." (*Id*. at ¶ 63.)

On August 2, 2021, Plaintiff (through its General Counsel Edward Grasse) sent Cease and Desist Letters to Campbell, Szafarski, and Smith. (*Id*. at ¶ 67.) *See also* Doc. No. 1-6. Despite receiving these letters, however, Defendants allegedly "continued their nefarious conduct without remorse." (Doc. No. 1 at ¶ 67.) In particular, Plaintiff alleges that Szafarski "accessed CLC's CRM for weeks without CLC's consent following the end of employment," at which time she "reviewed contact information and opportunity reports for a multitude of CLC clients with whom she did not work while employed by CLC." (*Id.* at ¶ 68.) Citing Log-in Activity reports obtained from Salesforce, Plaintiff claims that Szafarski accessed Salesforce nineteen (19) times between June 6, 2021 and August 4, 2021. (*Id.* at ¶ 69.) *See also* Doc. No. 1-7. The Verified Complaint sets forth a chart identifying the information accessed by Szafarski during this time period. (Doc. No. 1 at ¶ 71.) Among other things, this chart indicates that, after she left her employment at CLC, Szafarski accessed CLC's account information regarding over twenty of Plaintiff's clients. (*Id*.) Szafarski also allegedly accessed contact information regarding various clients, as well as internal CLC reports entitled "Opps Closing Next 30 Days—Field Sales" and "Opps Closed- QTD- Field Sales."[2] (*Id.*) In addition, Szafarski allegedly "analyzed the user profile of Smith, which includes information

---

[2] Plaintiff alleges that "[b]oth reports contain substantial amounts of confidential and proprietary information related to CLC's opportunities or prospects, including: the estimated nights per year each opportunity will book through CLC; the program selected by the client, the transaction and annual fees associated with the opportunity; the projected or actual close date; the stage of the opportunity (for example if a formal presentation has been given, if the opportunity is being qualified, or if the opportunity has converted to a client and is closed); and the last activity on the account." (Doc. No. 1 at ¶ 74.) Plaintiff further states that "[b]oth reports contain a disclaimer 'Confidential Information – Do Not Distribute.'" (*Id*. at ¶ 75.)

5

regarding the accounts Smith serviced and the opportunities Smith developed while employed by

CLC." (*Id.* at ¶ 72.)

On August 4, 2021, Plaintiff froze Szafarksi's account. (*Id.* at ¶ 77.) Two days later, on

August 6, 2021, Plaintiff (through outside counsel) sent a second Cease and Desist Letter, this time

addressed to Szafarski, Smith, and attorney Gena Gold. (Doc. No. 1-8.) Therein, Plaintiff states as

follows:

> Our firm represents Corporate Lodging Consultants, Inc. ("CLC" or the "Company").
> You received correspondence from CLC's General Counsel Edward Grasse earlier
> this week. At present, we have not heard anything from Ms. Smith or Ms. Szafarski.
> We had a brief telephone call with Ms. Gold representing Campbell Lodging, but we
> have not received anything in writing from her.
>
> Since Mr. Grasse sent his letters on Monday, we have accumulated substantial
> evidence of wrongdoing on the part of Ms. Smith, Ms. Szafarski, and Campbell
> Lodging (collectively, the "Campbell Parties"). We know that Ms. Szafarski accessed
> CLC's Sharepoint site on numerous occasions after the end of her employment with
> CLC. We suspect that this is only the tip of the iceberg with respect to CLC
> information that Ms. Smith and/or Ms. Szafarski retained after the end of their
> employment. We know that Ms. Szafarski told Cindy Rudovich (her supervisor at
> CLC) that she was going to move into incentive travel, but that she has instead been
> performing workforce lodging work for Campbell, which is exactly what she did for
> CLC and which is directly competitive. We know that Ms. Szafarski has been
> soliciting CLC clients, almost certainly while in possession of CLC trade secrets that
> she took from Salesforce before and/or after the end of her employment.  And we
> know that Campbell did not offer workforce lodging services before it hired Ms. Smith
> and Ms. Szafarski, which leads CLC to the conclusion that Campbell is using CLC's
> trade secrets, as well as Ms. Smith's services in violation of her Employment
> Covenants Agreement, to build a brand-new business. In other words, Campbell is
> choosing to steal what would take it too much time or money to build for itself.
>
> We have commenced drafting complaints and motions for temporary restraining
> orders that we intend to file in federal court. We plan to assert claims for breach of
> contract, tortious interference with contractual rights, and violations of state trade
> secret protection statutes, the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C.
> § 1831 et seq., and the federal Computer Fraud and Abuse Act ("CFAA"). We plan to
> push forward with these legal actions seeking injunctive relief and money damages.
> Please let us know if you have any questions or would like to discuss. We expect to
> hear from all of you by the close of business on Monday.

6

(*Id*.)

Plaintiff asserts that, despite its Cease and Desist Letters, Defendant Szafarski contacted one of Plaintiff's clients (identified as "Client 1") and "pitched room rates for lodging at the WoodSpring Suites in Montgomery, Alabama." (Doc. No. 1 at ¶ 82.) Plaintiff alleges that, as a result of her access to Plaintiff's confidential information, Szafarski was able to "undercut CLC's business and provide a cheaper quote to Client 1 on behalf of Campbell." (*Id*.) Szafarski also allegedly pitched Client 1 on deals for lodging in Tennessee, which Plaintiff claims is "another lodging project that CLC was actively negotiating for Client 1." (*Id*. at ¶ 83.) Plaintiff avers that "Client 1 contacted CLC to discuss Szafarski's deal and ask that CLC match her prices or lose its business." (*Id.* at ¶ 84.)

Additionally, Plaintiff alleges that "Szafarski and Smith approached Client 2 – a high-earning account for CLC – to switch its business to Campbell." (*Id*. at ¶ 85.) According to Plaintiff, "Szafarski contacted Client 2 on the personal cell phone of Client 2's representative and left a message to discuss the company's workforce lodging needs." (*Id*.) Plaintiff alleges that "[t]he fact that Szafarski contacted a Client 2 representative on the representative's cell phone is further evidence that she has obtained and used CLC trade secret information, as she did not service Client 2 for CLC and therefore would be unlikely to have the representative's cell phone number." (*Id*. at ¶ 87.) Finally, Plaintiff alleges that "[b]oth Client 2 and Client 1 were included on the most recent Monthly Production Report and the Closed Opp Report that were sent to CLC's sales directors only days before Szafarski and Smith quit and joined Campbell." (*Id.* at ¶ 87.) Plaintiff alleges, upon information and belief, that "Smith and/or Szafarski retained the Monthly Production Report and/or Closed Opp Report and used CLC's confidential customer information from this report to generate

leads for Campbell." (*Id.*) Plaintiff alleges that Szafarski and Smith have continued to contact Plaintiff's clients in an attempt to move their business from Plaintiff to Campbell.   (*Id.* at ¶ 88.)

### b. Procedural History

On August 18, 2021, Plaintiff filed a Verified Complaint for Damages and Injunctive Relief in this Court against Defendants Szafarski and Campbell.  (Doc. No. 1.)  Therein, Plaintiff alleges claims for (1) violations of the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq*. (Count One); (2) violations of the Ohio Uniform Trade Secrets Act, Ohio Rev. Code § 1333.61 (Count Two); (3) violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Count Three); (4) unjust enrichment; and (5) injunctive relief.  (*Id.*)  Plaintiff seeks a TRO, preliminary and permanent injunctive relief, compensatory and punitive damages, pre- and post-judgment interest, attorneys' fees and costs.  (*Id.* at pp. 25-26.)

On the same day, Plaintiff also filed a Motion for TRO, Preliminary Injunction, and Expedited Hearing with Memorandum of Law in Support.  (Doc. No. 3.)  Therein, Plaintiff seeks a temporary restraining order requiring Defendants "and all those acting in concert with them" to:

> (a) return to CLC all confidential, proprietary and trade secret information belonging to CLC that is within their possession;
>
> (b) refrain from retaining, using or disclosing confidential, proprietary and trade secret information belonging to CLC;
>
> (c) make available for inspection and/or imaging any computers, tablets, smartphones, external storage devices, personal data devices, or ESI storage accounts (such as cloud-based storage accounts) on which Szafarski or Smith accessed and/or retained CLC's confidential information or trade secrets as well as any and all Cloud-based file management accounts (including Gmail, iCloud, and Dropbox), email accounts, or other devices or accounts on which CLC's information could reside; and
>
> (d) make available for inspection and/or imaging any computers, tablets, smartphones, personal data devices, email accounts, or ESI storage accounts (such as cloud-based storage accounts) on which Defendants contacted, attempted to contact or otherwise

8

communicated with any CLC customer for the purpose of soliciting, developing, maintaining or servicing business in competition with CLC.

(*Id.* at p. 17.)  Plaintiff also requests entry of a preliminary injunction, enjoining and restraining Defendants from the conduct set forth above "with the preliminary injunction hearing to take place after the completion of expedited discovery in the matter."  (*Id.*)

On August 19, 2021, the Court conducted a telephonic status conference with the counsel for Plaintiff; counsel for Defendant Szafarski; Defendant Szafarski; and Robert Campbell, CEO of Defendant Campbell Resources.[3]  During the conference, the Court heard argument from all parties regarding Plaintiff's requests for a temporary restraining order and expedited discovery.  After discussion, the Court stated that it would grant Plaintiff's Motion for TRO in part and, further, that it would allow the parties to engage in limited, expedited discovery.  The Court noted that it would issue a written ruling on both of these issues forthwith.  In addition, after discussion with counsel, all parties agreed to schedule an in-person Preliminary Injunction Hearing on October 1, 2021.[4]  *See* Non-Document Order dated August 19, 2021.

## II.    Standard of Review

"A Temporary Restraining Order ('TRO') is an emergency measure."  *Hartman v. Acton*, --- F.Supp.3d---, 2020 WL 1932896 at * 1 (S.D. Ohio April 21, 2020) (citing *McGirr v. Rehme*, 2017 WL 1426456 at * 1 (S.D. Ohio Apr. 21, 2017)).  Federal Rule of Civil Procedure 65(b) requires a

---

[3] As noted *supra*, Ms. Gold, counsel for Defendant Campbell, was also present but, as she is not admitted in the State of Ohio, she did not speak on behalf of Defendant Campbell during the conference.  The Court did, however, permit Ms. Gold to communicate with Mr. Campbell to provide legal advice, as necessary, during the conference.

[4] The parties agreed that Mr. Campbell is not required to attend the Preliminary Injunction Hearing, due to his pre-existing travel plans.  The parties further agreed that Teri Goins will attend the hearing in his place as representative for Defendant Campbell.

Court to examine, on application for a temporary restraining order, whether "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant."  Fed. R. Civ. P. 65(b)(1)(A).  A temporary restraining order is meant "to prevent immediate and irreparable harm to the complaining party during the period necessary to conduct a hearing on a preliminary injunction."  *Dow Chemical Co. v. Blum,* 469 F. Supp. 892, 901 (E.D. Mich. 1979).  *See also Hartman*, 2020 WL 1426456 at * 1.

In determining whether to impose a TRO, the Court considers the same four factors as are considered for a preliminary injunction: (1) whether plaintiff has a substantial likelihood or probability of success on the merits; (2) whether plaintiff will suffer irreparable injury if the relief is not granted; (3) whether the injunctive relief would unjustifiably harm a third party; and (4) whether the public interest would be served by issuing the injunctive relief.  *See Frisch's Restaurant, Inc. v. Shoney's Inc*., 759 F.2d 1261, 1263 (6th Cir. 1985); *Am. Family Life Ins. Co. v. Hagan*, 266 F. Supp.2d 682, 687 (N.D. Ohio 2002).  The test is a flexible one and the factors are not prerequisites to be met but considerations that must be balanced against each other.  *See Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (citing cases); *In re DeLorean Motor Co*., 755 F.2d 1223, 1229 (6th Cir. 1985).  The plaintiff bears the burden of establishing entitlement to the extraordinary remedy of a temporary restraining order.  *See Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (citations omitted).

While no single factor is determinative, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000).  In addition, in the context of a temporary restraining order, there is emphasis on consideration of irreparable harm in order to preserve the status quo.  *See Just Funky, LLC v. Boom Trendz, LLC,* 2021 WL 2635377 at * 2 (N.D. Ohio June 25, 2021); *Reid v. Hood*, 2011 WL 251437 at *2 (N.D.

10

Ohio Jan. 26, 2011); *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996) ("[T]he purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had.").

### III.  Analysis

#### A.  Likelihood of Success on the Merits

First, the Court considers whether Plaintiff "has demonstrated 'a strong likelihood of success on the merits.'"  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)).  "In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success."  *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 402 (6th Cir. 1997).  Nonetheless, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."  *Id.*

Plaintiff first claims that Defendants misappropriated its trade secrets in violation of the Defense of Trade Secrets Act ("DTSA") and Ohio Uniform Trade Secrets Act ("OUTSA").  The definition of a trade secret and requirements for establishing misappropriation of trade secrets are substantially the same under the DTSA and OUTSA.  *See Aday v. Westfield Ins. Co.*, 486 F. Supp.3d 1153, 1160, n.6 (S.D. Ohio 2020) (collecting cases and citing among authority H.R. REP. 114-529 ("While other minor differences between the UTSA and Federal definition of a trade secret remain, the Committee does not intend for the definition of a trade secret to be meaningfully different from the scope of that definition as understood by courts in States that have adopted the UTSA.")); *Just Funky, LLC*, 2021 WL 2635377 at * 6 (same).  In order to prevail on a misappropriation of trade

11

secrets claim under the Ohio Uniform Trade Secrets Act, a plaintiff must prove: (1) the existence of

a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the

unauthorized use of a trade secret. *See Tomaydo-Tomahdo, LLC v. Vozary*, 82 N.E.3d 1180, 1184

(Ohio App. 8th Dist. 2017). *See also Goken America, LLC v. Bandepalya*, 2014 WL 6673830 at * 5

(S.D. Ohio Nov. 24, 2014).

### 1. Existence of a Trade Secret

The term "trade secret" is defined in the OUTSA as follows:

(D) "Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D). *See also MP TotalCare Services, Inc. v. Mattimoe*, 648 F. Supp.2d

956, 965 (N.D. Ohio 2009).[5] Courts consider six factors to determine whether an item constitutes a

trade secret:

(1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the

---

[5] Similarly, the DTSA defines the term "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . , whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if-- (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

12

information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. Besser v. Ohio State Univ.,* 89 Ohio St.3d 396, 732 N.E.2d 373, 378 (2000). *See also*

*Salemi v. Cleveland Metroparks*, 145 Ohio St.3d 408, 414, 49 N.E.2d 1296, 1302 (2016).

Here, Plaintiff alleges that "the customer information, including customer point of contact, private contact information, opportunity reports, CLC sales notes, and specific pricing that Szafarski accessed on CLC's CRM and Intranet following her departure from CLC are trade secrets of CLC" that are subject to protection under the DTSA and OUTSA. (Doc. No. 1 at ¶¶ 90, 105.) Plaintiff argues that this customer information is not publicly available or known outside of CLC and the amount of time and expense that it would take for others to develop it is considerable. (Doc. No. 3 at pp. 7-8.) Further, Plaintiff maintains that it takes reasonable steps to protect this information, including (1) limiting access to those employees with a need to know the information accessed; (2) requiring employees to review and acknowledge the Company's confidentiality and data protection policies; (3) requiring its sales and key employees to sign confidentiality and non-disclosure agreements; (4) IT security measures, such as password protection for all computers and segregation of certain files so that only employees with a need to access or edit the files can do so; and (5) exit procedures to remind employees of their obligation to return CLC property. (*Id*.)

The Court finds that there is a substantial likelihood that Plaintiff will be able to establish the existence of a trade secret. As an initial matter, both the OUTSA and DTSA specifically define a "trade secret" as including business and financial information. *See* Ohio Rev. Code § 1333.61(D); 18 U.S.C. § 1839(3). Moreover, courts have held that customer lists, pricing information, sales and marketing strategies, and other business information can constitute "trade secrets" under the OUTSA

13

provided the other requirements of that statute are met.  *See also Kuvedina, LLC v. Cognizant Technology Solutions*, 946 F.Supp.2d 749, 756 (S.D. Ohio 2013); *Avery Dennison Corp v. Kitsonas*, 118 F.Supp.2d 848, 854 (S.D. Ohio 2000).  Likewise, federal courts have held that customer lists, pricing information, sales and marketing strategies, and other business information can constitute "trade secrets" under the DTSA provided the other requirements of that statute are met.  *See e.g., Vendavo, Inc. v. Long, et al.,* 2019 WL 4139000 at * 6- 11 (N.D. Ill. Aug. 30, 2019); *API Americas Inc. v. Miller*, 380 F.Supp.3d 1141, 1148 (D. Kan. Apr. 5, 2019); *Select Energy Services, Inc., v. Mammoth Energy Services, Inc.,* 2019 WL 1434586 at * 5-6 (W.D. Okl. March 20, 2019).

In addition, as detailed above, Plaintiff asserts that its customer and business information is not publicly available or known outside of CLC and, further, that it takes a number of steps to protect this confirmation information.  The 'secrecy' requirement in trade secret law is not a demand of absolute secrecy."  *CPG Products Corp. v. Mego Corp.*, 1981 WL 59413 (S.D. Ohio Jan. 12, 1981).  *See also Dayton Superior v. Yan*, 2013 WL 1694838 at * 13 (S.D. Ohio 2013).  Rather, "courts are generally concerned with whether the trade secret owner has taken reasonable measures to protect the confidential information."  *Dayton Superior*, 2013 WL 1694838 at * 13.  Efforts to restrict physical access to trade secrets and requiring employees to execute confidentiality agreements have been found to be reasonable steps to protect trade secrets.  *See, e.g., Fred Siegel Co., LPA v. Arter & Hadden*, 85 Ohio St.3d 171, 707 N.E.2d 853, 862 (1999) (finding trade secret status justified where defendant kept client list on a password-protected computer, kept hard copies in office cabinets which were sometimes locked, and "probably" told its employees that its customer list were confidential); *Valco Cincinnati, Inc. v. N & D Machining Service, Inc*., 24 Ohio St.3d 41, 492 N.E.2d 814, 818 (1986) (finding trade secret status justified where employer kept plant locked, screened all visitors,

14

and restricted access to drawings contended to be trade secrets).  The protection of computerized records through password-based access restrictions has also been deemed reasonable protection.  *See, e.g, The Rightthing, LLC v. Brown*, 2009 WL 249694 at *8 (N.D. Ohio Feb. 2, 2009).

Here, Plaintiff asserts that it implemented password-based access protections, required its employees to review and acknowledge CLC's confidentiality and data protection policies, required certain of its sales employees to sign confidentiality and non-disclosure agreements, and maintained various policies to protect its confidential information.  (Doc. No. 1 at ¶¶ 30-32.)  The Court finds that there is a substantial likelihood that Plaintiff will succeed in demonstrating that it satisfied the second and third factors set forth above, i.e., that it took reasonable efforts to maintain the secrecy of its confidential information.

Finally, in its Verified Complaint, Plaintiff maintains that it took over 40 years and hundreds of thousands of dollars for it to develop the confidential customer information stored in Salesforce. (Doc. No. 1 at ¶¶ 25-27.)  In light of these averments, the Court finds, for purposes of the instant motion, that there is a substantial likelihood that Plaintiff will succeed in demonstrating that it satisfied the fourth, fifth, and sixth factors noted above; i.e., the savings effected and the value to the holder in having the information as against competitors; the amount of effort or money expended in obtaining and developing the information; and the amount of time and expense it would take for others to acquire and duplicate the information.

### 2.  Acquisition of a Trade Secret as a Result of a Confidential Relationship

Plaintiff must also demonstrate a substantial likelihood of success in demonstrating that Defendants acquired CLC's trade secrets as a result of a confidential relationship.  "A confidential relationship may be inferred from the circumstances surrounding the relationship between the owner

of the trade secret and the defendant." *Dayton Superior Corp*., 2013 WL 1694838 at * 15 (citing *Vanguard Transportation Systems, Inc. v. Edwards Transfer & Storage Co., General Commodities Division,* 673 N.E.2d 182, 185–86 (Ohio Ct. App. 10th Dist. 1996)).  Further, where an express agreement bars disclosure of trade secrets, the defendant acquires trade secrets through a confidential relationship. *MEMC Electronic Materials v. Balakrishnan,* 2012 WL 3962905 at *7 (S.D. Ohio Sept.11, 2012).

Here, Plaintiff asserts that Defendant Szafarski was formerly employed by Plaintiff as a Junior Sales Director and was given access to Salesforce, Talon and Genesis systems, and Plaintiff's Intranet.  (Doc. No. 1 at ¶¶ 33, 35, 36, 37, 38.)  Plaintiff further avers that Szafarski was expressly aware of CLC's confidentiality and non-disclosure requirements, by virtue of the fact that she acknowledged receipt of Plaintiff's Non-Disclosure Agreement and was subject to Plaintiff's various policies, including its confidentiality policies.  (*Id*. at ¶¶ 32, 40; Doc. No. 1-3.)  Thus, the Court finds there is a substantial likelihood that Plaintiff will demonstrate that Defendant Szafarski (and, by extension, Defendant Campbell) acquired Plaintiff's trade secrets as a result of a confidential relationship.

### 3.    Unauthorized Use of a Trade Secret

Lastly, Plaintiff must demonstrate a substantial likelihood of success in demonstrating Defendants' unauthorized use (or misappropriation) of a trade secret.  The OUTSA defines misappropriation as follows:

(B) "Misappropriation" means any of the following:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

16

(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

(a) Used improper means to acquire knowledge of the trade secret;

(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ohio Rev. Code § 1333.61(B). Similarly, the DTSA defines misappropriation as requiring the acquisition or disclosure of an improperly acquired trade secret. *See* 18 U.S.C. § 1839(5).

Here, Plaintiff avers that, after resigning from her employment at CLC, Szafarski repeatedly accessed Plaintiff's confidential and proprietary information saved in Salesforce without permission. (Doc. No. 1 at ¶¶ 6, 68, 69, 71; Doc. No. 1-7.)  Plaintiff further alleges that Szafarski then used the confidential information that she improperly obtained from Salesforce to solicit two of Plaintiff's clients.  (*Id.* at ¶¶ 82-88.)  Of particular note, Plaintiff avers that Szafarski used CLC's confidential customer pricing information to "undercut CLC's business and provide a cheaper quote to Client 1 on behalf of Campbell."   (*Id*. at ¶ 82.)  Further, Plaintiff states that Szafarski used a client representative's cell phone number (which she could only have obtained through her improper access to Salesforce) to solicit one of Plaintiff's clients.  (*Id*. at ¶¶ 85-87.)  Based on the above, the Court finds there is a substantial likelihood that Plaintiff will be able to demonstrate Defendants' unauthorized use of Plaintiff's trade secrets.

17

Accordingly, and for all the reasons set forth above, the Court finds that Plaintiff has shown a substantial likelihood of success on the merits of its DTSA and OUTSTA claims.  This factor, therefore, weighs in favor of granting Plaintiff's request for a temporary restraining order in part.  Specifically, the Court finds that this factor weighs in favor of granting Plaintiff's request that Defendants and all those acting in concert with Defendants be ordered to (a) return to Plaintiff all confidential, proprietary, and trade secret information belonging to Plaintiff that is within their possession; and (b) refrain from retaining, using, or disclosing confidential proprietary, and trade secret information belonging to Plaintiff.[6]  (Doc. No. 3 at p. 17.)

**B.      Irreparable Injury**

"[T]he second factor that a court must consider when deciding whether to issue a preliminary injunction is whether the plaintiff will suffer irreparable injury without the injunction." *Certified Restoration*, 511 F.3d at 550.  Plaintiff asserts that without a preliminary injunction, it will suffer irreparable injury from the loss of fair competition, the loss of its goodwill, and the misuse of its confidential information.  (Doc. No. 3 at pp. 12-13.)  For the following reasons, the Court concludes that Plaintiff has established that a temporary restraining order is necessary to prevent irreparable harm.

---

[6]  As noted above, Plaintiff also asks the Court to order Defendants to (1) make available for inspection and/or imaging any computers, tablets, smartphones, external storage devices, personal data devices, or ESI storage accounts (such as cloud-based storage accounts) on which Szafarski or Smith accessed and/or retained CLC's confidential information or trade secrets as well as any and all Cloud-based file management accounts (including Gmail, iCloud, and Dropbox), email accounts, or other devices or accounts on which CLC's information could reside; and (2) make available for inspection and/or imaging any computers, tablets, smartphones, personal data devices, email accounts, or ESI storage accounts (such as cloud-based storage accounts) on which Defendants contacted, attempted to contact or otherwise communicated with any CLC customer for the purpose of soliciting, developing, maintaining or servicing business in competition with CLC. *See* Doc. No. 3 at p. 17.  The Court declines to do so at this time.  Rather, as discussed below, the parties may address these issues through expedited discovery and at the Preliminary Injunction Hearing set for October 1, 2021.

A plaintiff's injury is considered "irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). "[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). According to the Sixth Circuit, "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Id.* at 512. *See also Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015) (holding that "[i]t is appropriate to use a preliminary injunction to avoid harms to goodwill and competitive position" where there is a "realistic prospect of lost sales and market share.")

In this case, without an injunction, Defendants would be free to take advantage of Plaintiff's confidential information and the goodwill that Szafarski established while at Plaintiff with her former customers to compete with Plaintiff. This would irreparably harm Plaintiff, as the resulting damages from the loss of Plaintiff's goodwill and the loss of fair competition from Defendants' conduct would be difficult to calculate. Indeed, Plaintiff avers that Szafarski has already solicited at least two of Plaintiff's clients by using Plaintiff's confidential information and that it has already suffered harm as a result. Thus, this factor also favors the issuance of a temporary restraining order.

### C. Harm to Others

Next, the Court must consider "whether a preliminary injunction would cause substantial harm to others." *Flight Options, LLC v. International Brotherhood of Teamsters, Local 1108*, 863 F.3d 529, 540 (6th Cir. 2017). Plaintiff asserts that a temporary restraining order would not affect third parties and that it would only prevent Defendants from benefitting through the improper use of Plaintiff's confidential information and goodwill. (Doc. No. 3 at pp. 15-17.) In this regard, Plaintiff

19

notes, in particular, that it is not seeking to prevent Defendant Szafarski from working at Campbell and, further, that it is "not trying to stop Defendants from building their own workforce lodging business from customers other than those currently serviced by CLC." (*Id.* at p. 16.)  Rather, "[i]t simply wishes to prevent Defendants from using CLC's trade secrets."  (*Id.*)

In light of the above, the Court concludes that any incidental harm to others would be minimal and does not weigh against granting a temporary restraining order to the limited extent described above.  "In assessing a motion for a preliminary injunction, this Court must consider whether the preliminary injunction would harm the party enjoined or others, and if so, whether such harm outweighs any irreparable harm established by the party seeking the injunction."  *Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp.2d 1028, 1045 (N.D. Ohio 2003).  Here, the Court finds that neither Defendant Szafarski, Defendant Campbell, or Ms. Smith would be harmed by the issuance of the temporary restraining order, as limited above.  Accordingly, the Court finds that this factor weighs in favor of granting the temporary restraining order as well.

### D.    Public Interest

The fourth and final factor courts must consider when granting a temporary restraining order is "whether the public interest will be served by an injunction."  *Flight Options*, 863 F.3d at 540. Plaintiff asserts that the public interest in preventing unfair competition supports the issuance of a temporary restraining order.  (Doc. No. 3 at p. 16-17.)  The Court agrees and finds that this factor weighs in favor of injunctive relief.[7]

### E.    Bond

---

[7] Because the Court finds that the four factors weigh in favor of granting a temporary restraining order with respect to Plaintiff's DTSA and OUTSA claims, the Court need not address Plaintiff's arguments with respect to its claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*

20

Because all of the factors favor the issuance of a temporary restraining order, the Court will grant Plaintiff's Motion for TRO as set forth above.  Pursuant to Fed. R. Civ. P. 65(c), courts "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).

Here, Plaintiff is not seeking to prevent either Defendant from engaging in business that does not relate to, or involve, Plaintiff's confidential information.  Thus, the Court finds (and the parties agreed during the August 19, 2021 status conference) that there is little likelihood that Defendants will have suffered any monetary damage in the event that the instant temporary restraining order was improperly entered.  Thus, the Court finds that bond is not necessary under the specific circumstances presented herein.  However, as discussed during the status conference, once Defendant Campbell retains counsel, it may make an appropriate motion for bond, if it so chooses.

### F.      Expedited Discovery

Plaintiff has also requested expedited discovery in order to prepare for the upcoming Preliminary Injunction hearing, which is currently set for October 1, 2021.  After discussion with the parties, the Court agrees that the parties may engage in limited, expedited discovery as follows.

Prior to the Preliminary Injunction hearing, the parties may exchange written discovery requests (including interrogatories and requests for production of documents) so long as they are reasonable in scope and not unduly burdensome.  In addition, the parties may conduct depositions, so long as counsel cooperates in the scheduling of these deposition and makes every effort to avoid unduly burdensome deposition requests.  In this regard, the Court notes that the parties have agreed

21

that, if Plaintiff wishes to depose Mr. Campbell, Plaintiff shall conduct this deposition prior to September 17, 2021, in order to accommodate Mr. Campbell's pre-existing travel plans.

In addition, and prior to the Preliminary Injunction Hearing, the Court directs the parties to work together to arrive upon a process or protocol for conducting a forensic examination of Defendants' electronic devices and accounts which were used to access (or may contain) Plaintiff's confidential information or trade secrets; and/or on which Defendants contacted, attempted to contact, or otherwise communicated with any of Plaintiff's customers for the purpose of soliciting business in competition with Plaintiff.

In the event the parties are unable to agree regarding the expedited discovery authorized by this Order, the parties are advised to follow this Court's Discovery Dispute Order, which is located on the website for the United States District Court, Northern District of Ohio. *See also* Local Rule 37.1.

## IV.  Conclusion

For the reasons set forth above, Plaintiff's Motion for TRO, Preliminary Injunction, and Expedited Hearing (Doc. No. 3) is GRANTED IN PART and DENIED IN PART as follows.  **IT IS HEREBY ORDERED** that:

A.  Defendants and all those acting in concert with them shall:

(i) return to CLC all confidential, proprietary and trade secret information belonging to CLC that is within their possession; and

(ii) refrain from retaining, using or disclosing confidential, proprietary and trade secret information belonging to CLC.

B.  The parties shall conduct expedited discovery prior to the Preliminary Injunction Hearing as set forth above.

C.     The Court shall conduct an in-person preliminary injunction hearing at 9:00 a.m. on October 1, 2021 in Chambers 16A.

**IT IS SO ORDERED.**

                                           *s/Pamela A. Barker*

                                           PAMELA A. BARKER

Date:  August 20, 2021                  U. S. DISTRICT JUDGE